UNITED STATES, Appellee

v.

CARLTON WILLIAMSON, Private E–2, U. S. Army, Appellant

4 USCMA 320, 15 CMR 320

No. 3898

Decided May 21, 1954

LT COL James C. Hamilton, U. S. Army, CAPT William C. Irby, Jr., U. S. Army, and 1ST LT Robert C. Taylor, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Benjamin C. Flannagan, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Appellant was convicted by a general court-martial of wrongful use of a habit-forming narcotic drug (morphine) in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for two years. The convening authority approved the findings and so much of the sentence as provided for a dishonorable discharge, total forfeitures, and confinement at hard labor for one year. The board of review affirmed without opinion and we granted accused's petition for review.

Briefly, the pertinent facts of the case are these: On the evening of April 12, 1953, after having consumed a considerable amount of alcoholic beverage, the accused entered the house of a Japanese National located in Sendai, Japan. During his stay a hypodermic injection was given to him by one of the female occupants of the place or by his companion. The accused's reaction to the injection was instantaneous and he lapsed into a coma. His condition caused alarm and he was taken by a military ambulance to a hospital where he was examined by a medical officer of the United States Army. While still unconscious from the effects of the drug, a specimen of urine was extracted from his bladder by the use of a catheter. The specimen was analyzed and the presence of morphine in the system was disclosed. The results of the analysis were offered in evidence; no objection to their admission was registered by the accused, and the testimony was admitted. We granted accused's petition for review on two

**321**

issues, but our conclusions on the first is dispositive of the case and the second becomes immaterial. The issue to be resolved is whether the obtaining of the evidence from the accused by use of a catheter, without warning and without knowledge on his part, constituted a violation of Article 31, Uniform Code of Military Justice, 50 USC § 602, which, for the purpose of this case, we will equate to the Fifth Amendment to the Constitution.

On three previous occasions we have answered questions involving the privilege against self incrimination which arise out of factual situations different from, but similar to, the one which now confronts us. Specifically, we concluded in United States v. Rosato, 3 USCMA 143, 11 CMR 143; United States v. Eggers, 3 USCMA 191, 11 CMR 191; and United States v. Greer, 3 USCMA 576, 13 CMR 132, that an accused is protected by the provisions of the Uniform Code of Military Justice from being compelled to give evidence against himself either by word of mouth or by furnishing specimens of his handwriting. In those holdings, we attempted to distinguish the handwriting and verbal utterance situations from the fingerprint, foot-in-footprint, coat and hat fitting cases, on the grounds that the former required active and conscious use of the mental faculties on the part of an accused to complete the chain of incriminating circumstances, while the latter involved the production of testimony which could be obtained without compelling the accused to use any of his senses to assist in his conviction. Our duty here is to develop further the concepts and place catheterization in its proper category. In doing so, we limit ourselves to the scope of the privilege against self incrimination for, as we develop the subject, it will become apparent why we find here neither a violation of military due process nor unreasonable search and seizure. Moreover, we will not concern ourselves with collateral issues such as might be involved in cooperation on the part of the accused or waiver of his privilege.

Determination of the issue is aided by evaluating the conflicting concepts found in the civilian cases which have given thought and consideration to the problem. We first refer to the state cases. In those jurisdictions we find one line of authorities dealing with the extraction of fluids from the human body by scientific means and without permission, which hold that the privilege against self incrimination is not violated as the privilege is limited to testimonial utterances of the defendant, either oral or written. This view is supported by the weight of authority and the later decided cases. Generally speaking, the rationale is founded on the concept that the privilege was created to prohibit a defendant from being compelled to confess his own sins. For example, the court in Commonwealth v. Statti, 166 Pa Super 577, 73 A2d 688, at page 691, states:

" '. . . "Unless some attempt is made to secure a communication, written or oral, upon which reliance is to be placed as influencing his consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one." 8 Wigmore on Evidence (3d Ed) 375, sec 2265'. (Emphasis ours.) The distinction may rest upon practical grounds, but certainly one lawfully arrested may not refuse to submit to finger printing, nor to a search of his person. So also the constitutional privilege does not allow a defendant to refuse a witness the opportunity of seeing him and hearing his voice, for the purpose of identification. Cf. Johnson v. Commonwealth, 115 Pa 369, 395, 9 A 78. The privilege did not prevent the Commonwealth from requiring some of the defendants to stand in the presence of the jury, as they were identified by a witness in Commonwealth v. Safis et al., 122 Pa Super 333, 186 A 177. Wigmore on Evidence, (3d ed) VIII contains a discussion of the subject and in § 2263 it is stated that historically the object of the privilege was to prohibit 'the employment of legal process *to extract from the person's own lips* an admission of his guilt which will thus take the place of other evidence.' And Wigmore states the general principle of construction thus: 'The

privilege protects a person from any disclosure *sought by legal process against him as a witness.*' In other words the protection afforded under the generally accepted rule, is a privilege against testimonial compulsion, and no more. While there is a conflict of authority outside of Pennsylvania as to whether anyone other than the accused may testify as to the result of blood tests, urine tests, or other physical examination of the accused made without his consent, in our opinion the better considered cases hold that the privilege against self-incrimination is not thereby violated."

In Block v. People, 125 Colo 36, 240 P2d 512, where blood was taken from the accused while unconscious, the Colorado Supreme Court said:

"A study of the history of the development of such a constitutional provision as contained in our Colorado Constitution indicates that the original intent was to prevent a defendant from being forced to give testimonial evidence against himself, and did not contemplate the exclusion of evidence of physical facts relating to the defendant. 8 Wigmore on Evidence (3d ed) p 276, § 2250. This line of demarcation is clearly set forth in Mr. Justice Holmes' opinion in Holt v. United States, 218 US 245, 31 S Ct 2, 6, 54 L Ed 1021, as follows: 'Another objection is based upon an extravagant extension of the 5th Amendment. A question arose as to whether a blouse belonged to the prisoner. A witness testified that the prisoner put it on and it fitted him. It is objected that he did this under the same duress that made his statements inadmissible; and that it should be excluded for the same reasons. But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in

proof. Moreover, we need not consider how far a court would go in compelling a man to exhibit himself. For when he is exhibited, whether voluntarily or by order, and even if the order goes too far, the evidence, if material, is competent. Adams v. New York, 192 US 585, 24 S Ct 372, 48 L Ed 575.'"

In State v. Cram, 176 Ore 577, 160 P2d 283, 289, which has been cited in many later cases, the Supreme Court of Oregon held admissible testimony concerning the alcoholic contents of a blood sample taken from an unconscious victim. That court expressed its view in the following language:

". . . The blood sample was obtained without the use of any process against him [accused] as a witness. He was not required to establish the authenticity, identity or origin of the blood; those facts were proved by other witnesses."

The court went on to say:

"If the evidence here under attack is inadmissible, it is difficult to understand under what theory fingerprints procured under compulsion, or evidence concerning them, as admissible. It is equally difficult to comprehend why the defendant is not denied his constitutional privilege against self-crimination by being required to do the many acts hereinbefore enumerated."

There are many other jurisdictions announcing the same rule, and the statements following the citations are illustrative of the manner in which the evidence was obtained. In all cases, the evidence was held to be admissible. In People v. Tucker, 88 Cal App 2d 333, 198 P2d 941, a specimen of blood was taken from the defendant by a doctor at the request of police officers; in People v. One 1941 Mercury Sedan, 74 Cal App 2d 199, 168 P2d 443, a substance was pumped from defendant's stomach; in State v. Sturtevant, 96 NH 99, 70 A 2d 909, a sample of blood was taken from an accused incapable of giving consent; in State v. Ayres, 70 Idaho 18, 211 P 2d 142, blood was extracted from the veins of an unconscious defendant; in Skidmore v. State, 59 Nev 320, 92

**323**

P2d 979, a doctor examined a defendant for the purpose of determining whether he was infected with social disease; in Davis v. State, 189 Md 640, 57 A 2d 289, blood was obtained from accused by subterfuge; and in State v. Alexander, 7 NJ 585, 83 A 2d 441, blood was extracted from accused by use of a hypodermic needle.

The contrary view is not without support in some state cases although they are limited in number. Furthermore, in a few of the cases we have cited in support of the other view, there are vigorous dissents. Representative of this particular line of authorities is the case of Apodaca v. State, 140 Tex Cr 593, 146 SW 2d 381. There the court held inadmissible testimony concerning the taking and results of intoxication tests given a defendant, as well as the tests made on a specimen of urine taken from him. That court asserted:

". . . Demonstration by an act 'which tends to self-incrimination is as obnoxious to the immunity guaranteed by the Constitution as one by words.'

. . . . .

". . . The rights intended to be protected by the constitutional provision that no man accused of crime shall be compelled to be a witness against himself are so sacred, and the pressure toward their relaxation so great when the suspicion of guilt is strong and the evidence obscure, that it is the duty of courts liberally to construe the prohibition in favor of personal rights, and to refuse to permit any steps tending toward their invasion. Hence, there is the well-established doctrine that the constitutional inhibition is directed not merely to the giving of oral testimony, but embraces as well the furnishing of evidence by other means than by word of mouth, the divulging, in short, of any fact which the accused has a right to hold secret."

In Bethel v. State, 178 Ark 277, 10 SW 2d 370, 371, defendants were convicted of the crime of rape and appealed. A physician was permitted, over the objection of the defendants, to testify on the day following the crime that, at the request of the sheriff, he had made a physical examination of both defendants and found them afflicted with a venereal disease. The judgment appealed from was reversed. The court, after referring to the provision in the state constitution against compelling a person in a criminal case to be a witness against himself, and quoting from two Missouri cases, stated:

". . . This testimony did not tend to prove the crime charged, but only tended to prejudice, degrade, and humiliate them before the jury. The majority of the court is of the opinion that the court committed reversible error in admitting the testimony of Dr. McCall."

Several Iowa decisions are of importance. State v. Height, 117 Iowa 650, 91 NW 935, and State v. Weltha, 228 Iowa 519, 292 NW 148, are consistently cited as authority for extending the privilege beyond testimonial compulsion. While each discusses the privilege, the results of physical examinations were there excluded on the ground they were obtained by unlawful search and seizure. It is of interest to note that the court in State v. Height, supra, had substantial doubts whether the Iowa Constitution, which provides merely that defendants in criminal proceedings shall be competent witnesses in their own behalf but cannot be called by the State, was broad enough to cover the general ground of the usual constitutional guarantee against self-incrimination.

In State v. Newcomb, 220 Mo 54, 119 SW 405, we find that the Supreme Court of Missouri held that testimony by a doctor as to the cause and results of his physical examination of defendant, accused of rape, was inadmissible and violative of defendant's right not to be compelled to testify against himself. As authority this court cited State v. Height, supra, and State v. Young, 119 Mo 495, 24 SW 1038.

Having presented the state cases, we pass on to consider a few of those decided by Federal courts. At the present time they must be catalogued as not holding that the evidence is inadmissi-

ble. Many of the state authorities quote from the opinion of Mr. Justice Holmes of the Supreme Court of the United States in Holt v. United States, 218 US 245, 31 S Ct 2, 54 L ed 1021. One quotation found in this opinion includes the important portion of the holding of that Court in that case and repetition at this point is unnecessary. No subsequent Supreme Court case has modified the principles enunciated in that opinion.

There are two circuit court of appeals cases which, while not touching on the precise question, are straws in the wind blowing in the direction of the admissibility of the evidence. In Bratcher v. United States, 149 F 2d 742 (CA 4th Cir), the defendant was ordered to take a physical examination for purposes of induction. Prior thereto he had taken benzedrine to increase his blood pressure and a urine analysis disclosed its presence. In ruling on the admissibility of that evidence in the criminal case, the court stated:

"We do not think that defendant's physical examination could possibly be considered an unlawful search and seizure. The evidence was obtained under the Selective Training and Service Act and the regulations issued thereunder. We are therefore of the opinion that there was no violation of the Fifth Amendment in admitting this evidence.

"We are of the opinion that the action of the court below in refusing the motion to suppress the evidence was correct and that no constitutional rights of the defendant were violated by the admission of the evidence."

In McFarland v. United States, 150 F 2d 593 (CA DC Cir), we find the views of the judges of that Circuit Court expressed in the following language:

"Blood was discovered on appellant's body after the crime, by an examination to which appellant, an enlisted man, submitted under a military order. Though the court ruled out this evidence and instructed the jury to disregard it, the jury had heard something about it and may have been unable to disregard what they had heard. However, we think the evidence was admissible. 'The prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material.' Out of court as well as in court, his body may be examined with or without his consent."

The parties in the instant proceedings rely on Rochin v. California, 342 US 165, 72 S Ct 205, 96 L ed 183, to support their respective contentions. In light of the issues, the posture of the evidence, and the views expressed in the principal and concurring opinions in that case, we conclude that implicit in the holding is the rule that extractions of fluid from the bloodstream or foreign substances from the stomach are violations of the Fourteenth Amendment to the Constitution, provided they are obtained by means which offend against the canons of decency and fairness. Conversely, if they do not, then a state is free to obtain evidence in that manner. To bring into bold relief our reasons for so concluding, we quote first from one of the concurring opinions and then from the majority holding. We select the language used by Mr. Justice Douglas because his view on this one issue was concurred in by Mr. Justice Black:

"As an original matter it might be debatable whether the provision in the Fifth Amendment that no person 'shall be compelled in any criminal case to be a witness against himself' serves the ends of justice. Not all civilized legal procedures recognize it. But the choice was made by the Framers, a choice which sets a standard for legal trials in this country. The Framers made it a standard of due process for prosecutions by the Federal Government. If it is a requirement of due process for a trial in the federal courthouse, it is impossible for me to say it is not a requirement of due process for a trial in the state courthouse. That was the issue

**325**

recently surveyed in Adamson v. People of State of California, 332 US 46, 67 S Ct 1672, 91 L Ed 1903. The Court rejected the view that compelled testimony should be excluded and held in substance that the accused in a state trial can be forced to testify against himself. I disagree. Of course an accused can be compelled to be present at the trial, to stand, to sit, to turn this way or that, and to try on a cap or a coat. See Holt v. United States, 218 US 245, 252–253, 31 S Ct 2, 6, 54 L Ed 1021. But I think that words taken from his lips, capsules taken from his stomach, blood taken from his veins are all inadmissible provided they are taken from him without his consent. They are inadmissible because of the command of the Fifth Amendment."

The majority of the Court refused to adopt that view and concluded to base their decision on the due process clause. Mr. Justice Frankfurter, speaking for the Court, applied general observations to the circumstances of the case and announced the majority rule in the following language:

"Applying these general considerations to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents— this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation."

Many of the cases cited in this opinion are carried in the footnotes of that decision, and it would thus appear that the issue of taking evidence from the body of a defendant, unaccompanied by brutality, was considered but rejected as violating the due process clause. See

also Adamson v. California, 332 US 46, 67 S Ct 1672, 91 L ed 1903. When the majority of the Supreme Court elected to base their decision on the method of obtaining the evidence, they inferentially held that, had humane methods been used, the rule of the Adamson case would have controlled. The decision, of course, leaves untouched the area of the Fifth Amendment except as it is mentioned in the two concurring opinions. But the Court's opinion recognizes a field in which minds of reasonable men may differ. The opinion (Rochin v. California, supra) illuminates the area in which we are treading by stating:

"In deciding this case we do not heedlessly bring into question decisions in many States dealing with essentially different, even if related, problems. We therefore put to one side cases which have arisen in the State courts through use of modern methods and devices for discovering wrongdoers and bringing them to book."

The California Supreme Court in the case of People v. Haeussler, — Cal App —, 260 P2d 8, considered its previous holdings in the light of the decision of the United States Supreme Court in the Rochin case, supra. That court arrived at the conclusion that the United States Supreme Court decision was based on the method of obtaining the capsule rather than on the grounds that there was a violation of the right against self incrimination. Mr. Justice Edmonds, speaking for the court, expressed the following views:

"The essence of the Rochin decision is in the court's reference to Brown v. State of Mississippi, 297 US 278, 56 S Ct 461, 80 L Ed 682, and other coerced confession cases. In the Brown case, a conviction based upon a confession obtained by torture was reversed because such a practice amounted to a wrong 'so fundamental that it made the whole proceeding a mere pretense of a trial and rendered the conviction and sentence wholly void'. 297 US at page 286, 56 S Ct at page 465. So, in the Rochin case, the court said: 'Use of involuntary

verbal confessions in State Criminal trials is constitutionally obnoxious not only because of their unreliability. They are inadmissible under the Due Process Clause even though statements contained in them may be independently established as true. Coerced confessions offend the community's sense of fair play and decency. So here, to sanction the brutal conduct which naturally enough was condemned by the court whose judgment is before us, would be to afford brutality the cloak of law. Nothing would be more calculated to discredit law and thereby to brutalize the temper of a society.' 342 US at pages 173–174, 72 S Ct at page 210, 96 L Ed 183. In brief, the Rochin case holds that brutal or shocking force exerted to acquire evidence renders void a conviction based wholly or in part upon the use of such evidence."

The question in the case at bar has been presented thoroughly by Dean Wigmore in his work on Evidence. In United States v. Eggers, supra, we gave consideration to his views. However, to develop further the matter, we set out his test. Volume VIII, section 2263, states:

"Looking back at the history of the privilege (*ante*, § 2250) and the spirit of the struggle by which its establishment came about, the object of the protection seems plain. It is the employment of legal process to *extract from the person's own lips* an admission of his guilt, which will thus take the place of other evidence. Such was the process of the ecclesiastical Court, as opposed through two centuries,—the inquisitorial method of putting the accused upon his oath, in order to supply the lack of the required two witnesses. Such was the complaint of Lilburn and his fellow-objectors, that he ought to be convicted by other evidence and not by his own forced confession upon oath.

. . . . .

"In other words, it is not merely any and every compulsion that is the kernel of the privilege, in history and in the constitutional definitions, but *testimonial compulsion*. The one idea is as essential as the other.

"The general principle, therefore, in regard to the form of the protected disclosure, may be said to be this: The privilege protects a person from any disclosure *sought by legal process against him as a witness*."

It is contended that our decisions in the handwriting and voice cases extended the doctrine beyond the purview of that quotation. We can assume, without deciding, that there is merit in that contention; but, if so, we broadened the rule to protect the accused. However, as stated in Eggers, supra, Wigmore, in his model code of evidence, included handwriting as being within the privilege. He did not include blood sampling although that method is mentioned in his works on Evidence and the omission might be for the reason that he considered it outside the privilege. Be that as it may, we have charted our course and set out our test for admitting and rejecting evidence claimed to be self-incriminating. The test was phrased somewhat differently in United States v. Eggers, supra, and in United States v. Rosato, supra, but it is one and the same. In the former, Judge Brosman outlined the guiding principle in the following language:

". . . Indeed, there is a distinct difference between the present handwriting problem, on the one hand, and the fingerprint and the foot-in-footprint situations, on the other. The latter require only *passive* cooperation, whereas the former requires *active* participation and *affirmative* conduct in the production of an incriminating document not theretofore in existence."

In the latter, Chief Judge Quinn stated the test to be:

". . . The compulsory production of a handwriting specimen goes far beyond the taking of a fingerprint, placing a foot in a track, an examination for scars, forcibly shaving a man or trimming his hair, requiring him to grow a beard, or try on a garment. Such instances do

**327**

not involve an affirmative conscious act on the part of the individual affected by the demand. Whereas the printing of the alphabet involves a conscious exercise of both mind and body, an affirmative action."

Applying the test prescribed in those cases, or the one relied on by the weight of authority in civilian ▉▉▉ ▉ courts, we are constrained to hold that taking the sample of urine obtained from the accused, while unconscious, did not violate his privilege under Article 31 of the Uniform Code of Military Justice, supra.

One further matter bears discussion. The taking of fluids from the body by scientific means to aid in prosecuting may shock the conscience of some people. Undoubtedly it invades the right of privacy, but so do many other acts which are performed within the law. That right, like others, must be considered in the light of the Government's right and duty to use humane methods and scientific means to detect crime. We expressly condemn acts which savor of brutality but responsible courts manned by outstanding jurists, and many enlightened students sympathetic to the rights of a defendant, have concluded that the methods employed here are within the standards which the public conscience will approve.

To substantiate this statement, we refer to the many cases cited in support of the admission of the evidence, to the failure of the Supreme Court to hold the method denied a defendant due process of law, and to the American Law Institute's Model Code of Evidence. The Council of the American Law Institute sets out a statute prohibiting self incrimination (Rule 203, Self-Incrimination; General); but it added another provision relating to bodily examination (Rule 205, Self-Incrimination; Bodily Examination), in which it is spelled out that "No person has a privilege under Rule 203 to refuse . . . (b) to furnish or to permit the taking of samples of body fluids or substances for analysis." It is unbelievable that the new rule would be offered for acceptance by the legal profession if it

offended against the demands of fair play and decency. A comment on the rule by the National Conference of Commissioners on Uniform State Laws explains both the reason for its inclusion and its effect in the following language:

". . . It is necessary here to be consistent with the policy of the Uniform Act on Blood Tests to Determine Paternity. Resistance to the forceable extraction of body fluids is not justified on the ground of privilege against self-incrimination, but may be warranted on the ground of violation of the right of personal immunity, if proper safeguards, such as supervision by a physician, are not provided. The rule does not attempt to solve that constitutional question, but limits its application strictly to the privilege against self-incrimination. A sample of spittle or a sample of stomach contents may be equally incriminating and they are on the same ground under this rule. But the taking of the sample from the stomach by stomach pump may be viewed very differently from the other when it comes to the question of safeguards to be taken to assure nonviolation of the right of security of one's person." [Comment on Rule 25, Uniform Rules of Evidence drafted and approved by the National Conference of Commissioners on Uniform State Law at its annual conference in Boston, Massachusetts, August 17–22, 1953.]

We are not here presented with a factual situation in which the urine was obtained by force and violence or brutal methods, or where proper medical safeguards were not provided. Hence, a violation of the right of security of the person is not involved. We recognize the existence of that area and when the question is presented in a case in which application of that rule is relevant it will be disposed of on the basis of the facts involved. In the present instance it is sufficient that we hold the extraction of urine from the accused did not violate the rule against self incrimination.

For the foregoing reasons, the decision of the board of review is affirmed.

BROSMAN, Judge (concurring):

My interpretation of the applicability of Rochin v. California, 342 US 165, 96 L ed 183, 72 S Ct 205, 25 ALR2d 1396, with respect to the issues of the present case accords more nearly with that of Judge Latimer than with the view of the dissenting judge. As I read it, that case simply held that the use of certain evidence in a California court violated due process concepts enjoined by the Fourteenth Amendment, because the evidence consisted of information obtained through subjecting the accused to stomach-pumping—forcibly and over his protest.

If the case before us involved real evidence obtained from an accused person by use of a catheter and *over his protest,* I should similarly conclude that fundamental standards of decency in law enforcement had been infringed, and that a conviction predicated in any part on such evidence violated the concept of "military due process." I find no real difficulty in distinguishing the result in such an instance from an obtaining of blood samples by force.

In the first place, catheterization involves infinitely more physical discomfort than the mere pricking of a suspect's finger—although it is perhaps not so painful as the dissenting judge implies. The degree of distress caused by this medical procedure—I am informed—will depend on a number of factors, principally the suspect's threshold of pain, his nervousness and tension at the time, and the skill of the operator. Second, at least some slight risk of urinary tract infection is associated with the challenged operation. In this regard, a mitigating circumstance would be present, of course, if the extraction were performed—as in the instant case—by a qualified physician. A third—and to my mind a most important factor—is the psychological impact potential possessed by this type of scientific exploration. The extraction

of the fluid is, of course, from the male reproductive organ. Subconscious fears associated with this area are substantial—indeed so great that many schools of psychoanalysis place special emphasis on the role of the "fear of castration." In addition, an accused might well entertain distinctly conscious fears of infection from the operation. Finally, if forcible catheterization were permitted, a sublimated "third degree"—one embracing pseudoscientific menaces—might easily result. By this I mean to suggest that the fear of injury to the organs concerned is so massive and pervading that a suspect might tend to choose confession as a route of escape from the threat of catheterization. And investigators might seek to accelerate the unburdening of an accused's conscience by implying subtly that—unless he talked—it would be necessary to search, say, his urinary tract for evidence.[1] In light of these considerations, I must hold that the forcible extraction of urine from a protesting accused is as noxious as the use of a stomach pump over objection.

While physical force may not be exerted to obtain samples of urine, I doubt that the furnishing of them falls within the purview of the privilege against self incrimination. As Judge Latimer properly points out, this privilege should not be extended to include real evidence in the form of bodily fluids, which in no wise involve testimonial utterances. At least one criterion for use in the solution of the instant problem takes the form of an inquiry into whether the accused is being required to *create* evidence. An Air Force board of review recently utilized this test in a well-reasoned opinion which I adopt for the present purpose. See United States v. Brints, ACM 8386, 15 CMR 818.

Both handwriting samples and spoken words—the evidentiary items involved in Rosato, Eggers, and Greer, cited by my brothers—involve a creative performance on the part of the accused. Without his conscious affirmative ac-

---

[1] One instance of a similar method of extracting a confession has been reported to me by a former service law enforcement officer, who participated in the transaction.

tion, they can never exist; they could not possibly be—apart from a positive exercise of will by him. Conceivably the accused might live out the remainder of his life without either speaking or writing—although admittedly the prospect would not be happy. The creation of urine, on the other hand, eventuates apart from any sort of effort of will, and involves only involuntary and unavoidable physiological functions. In this sense, therefore, no "creativeness" is essential to the formation or discharge of this fluid. The conscious mind controls only the time and place of essential disposal. Accordingly, I am sure that—unlike the ▮▮▮▮▮▮ ▮ rule in the situations involving handwriting and voice exemplars—a person suspected on reasonable grounds may lawfully be required by an order from superior authority to furnish urine samples for chemical analysis. Obviously, under my view, Article 31 does not ▮▮▮▮▮▮ ▮ apply to demand any sort of warning to the accused, since he could be directed to furnish a sample were he initially to decline to do so, and since such a sample can scarcely be considered a "statement"— for the latter term refers solely to testimonial utterances. United States v. Milton, ACM S–7345, 13 CMR 747.

The case at hand involved neither an order nor the extraction of urine over the accused's protest. Instead, he was totally unconscious when the withdrawal occurred. Accordingly, of the four factors which served to induce my conclusion that forcible catheterization must be deemed unlawful, the single one present here is the possibility of infection arising from the insertion of the instrument. Since a qualified physician carried out the procedure, and apparently acted in an approved professional fashion, I do not feel justified in asserting that the process embraced so fundamental a violation of decency as to require reversal of the findings. Instead, the method of detection employed seems permissible, since the accused was unconscious, and since it is clear that no action of law enforcement personnel contributed to his insentience.

Moreover—and conceding arguendo

that the catheterization of an unconscious suspect might be deemed illegal— there is no clear showing in the case before us now that the extraction did not constitute a reasonable measure of medical diagnosis, as opposed to a method of crime detection. In short, the record does not make manifest a violation of any of the accused's rights— such, for example, as would be demanded for reversal under the principle of United States v. Josey, 3 USCMA 767, 14 CMR 185. Furthermore, if illegality be regarded as present in the extraction of the urine sample, I suspect that in essence we are here confronted with an illegal search and seizure—or something very like it—with the result that any claim of illegality would have been waived by reason of the accused's failure to object to the evidence obtained thereby. United States v. Dupree, 1 USCMA 665, 5 CMR 93.

Finally a survey of the defense's theory of the case—as clearly revealed in the instant record— ▮▮▮▮▮▮ ▮ makes it apparent to me that the use at the trial of the results of analysis of the fluid sample obtained from the accused while unconscious could not merit reversal— whether under an invocation of "divine law," the "law of nature," or any other sort of law. The prosecution offered the testimony of the mamasan in whose house of call the accused allegedly had used narcotics. Thereafter trial counsel tendered in evidence the results of the urinalysis. The defense presented no objection to this evidence. Instead, both Private Williamson, the present appellant, and a co-accused took the stand to advance the theory that—although the former had received the narcotic—he had not known what he was doing at the time. In the version presented by the defense, indeed, the mamasan and her aiders and abettors loomed as the villains of the piece. They injected Williamson with narcotics while he was too intoxicated to have any notion of what was transpiring. By this theory of defense, the accused was precluded—it seems to me—from advancing at the appellate level any contention that he was prejudiced by the use of inadmissible evidence at the

trial. Cf. United States v. Henry, 4 USCMA 158, 15 CMR 158 (all opinions).

QUINN, Chief Judge (dissenting):

I dissent.

At the outset, I desire to make it crystal clear that in my opinion any accused in the military service is entitled not only to the benefits of the Uniform Code of Military Justice, but to the safeguards of the Bill of Rights of the Constitution of the United States as well, and, as a human being, is also entitled to the protections of both natural and divine law.

We have held that it is a violation of the fundamental rights of an accused to require him to write his name in court, to print the alphabet, and to read from the Manual for Courts-Martial, when these requests were designed to convict him of crime. See United States v. Rosato, 3 USCMA 143, 11 CMR 143; United States v. Eggers, 3 USCMA 191, 11 CMR 191; United States v. Greer, 3 USCMA 576, 13 CMR 132. We have likewise made it quite plain that there would be no violation of either the provisions of the Code or of the protections of the Constitution in requiring an accused to submit to fingerprinting, footprinting, trying on a coat, submitting his body to external examination for marks, scars, and so forth, or in requiring him to stand up in a courtroom for the purpose of identification; nor would we even consider it a violation of the Code, or the Constitution, to use a sample of blood or urine obtained from the accused *with his consent*. United States v. Booker, 4 USCMA 335, 15 CMR 335. We are now faced squarely with the question of whether or not it is lawful to forcibly extract by use of a catheter a sample of urine from the body of an accused, and then use that sample for the purposes of conviction.

There are several state cases which discuss the propriety of forcibly abstracting from an accused samples of blood and samples of urine. In this case we are not dealing with samples of blood, but in my opinion it would be much simpler to justify the extrac-tion by a needle from the tip of a finger a sample of blood which was later to be used as evidence against an accused. After all, the fingers are commonly exposed to the public view. There is no appreciable pain caused by the extraction, and certainly no degradation even remotely connected with such an act. Whether other cogent reasons exist which would make such a practice a questionable one, I am not now called upon to decide.

However, when we come to the use of a catheter forcibly and against the protests of the accused, or when, as in this case, a catheter is used upon the body of the accused when he is completely unconscious, then we face another problem.

The majority, in its opinion, cites the decisions of several courts which purport to justify the extraction of fluids from the human body against the will of a defendant by catheter, stomach pump, and so forth. The majority also frankly and fairly admits that there is good authority to the contrary. The case of Commonwealth v. Statti, 166 Pa Super 577, 73 A2d 688, refers to extracting testimony from a *person's own lips*. We have definitely decided that the protections of Article 31 and the Uniform Code extend far beyond testimonial compulsion. This case, therefore, is of little or no value as support for the majority's conclusion.

Another case cited by the majority to support its position is Block v. People, 125 Colo 36, 240 P2d 512. A careful scrutiny of the paragraph quoted from that decision makes it definitely plain that there was in that case no use of either physical or moral compulsion to extort any communication from him. In other words, the court there held that compelling a man, in a criminal court, to put on a coat would be no violation of his rights under the Fifth Amendment of the Constitution. With this proposition, of course, I would wholeheartedly agree; but certainly using a catheter upon an unconscious man falls within an entirely different category. We have the utmost respect for the decisions of the state courts, and recognize their wis-

dom and logic. We often cite them to support our own conclusions. But it must be clear to everyone that the decisions of the state courts are not binding upon us; and if we conclude, in the matter under consideration, that there is a violation of either the Uniform Code of Military Justice, or of the Fifth Amendment to the Constitution of the United States, we should reverse in spite of any number of state decisions to the contrary.

Both Federal cases cited by the majority in support of its conclusions certainly do not apply to the situation in this case. In Bratcher v. United States, 149 F2d 742 (CA 4th Cir), the defendant was charged with evading the Selective Service Act by consuming benzedrine. Prior to the trial, he moved to suppress evidence obtained in the physical examination which was a part of the induction proceedings. The motion was denied on the ground that the accused did not sustain the burden of proving his claim that the object of the examination was to obtain evidence against him for a criminal proceeding. In affirming the action of the trial court, the Court of Appeals said:

"The trial judge took evidence on the motion to suppress the evidence obtained while the defendant was in the hospital. A number of witnesses were heard and the trial judge in an able written opinion overruled the motion on the ground that the defendant had 'totally failed to carry the burden resting on him'. The determination of this question by the trial judge was the determination of a question of fact and was sustained by substantial direct evidence offered on behalf of the Government. Had the examination of the defendant shown that he was physically fit for induction into the limited services he would have been inducted at once and there was no evidence offered to show that the authorities intended anything other than to comply with the regulations and induct the defendant if he was found acceptable.

"We do not think that defendant's physical examination could possibly be considered an unlawful search and

seizure. The evidence was obtained under the Selective Training and Service Act and the regulations issued thereunder. We are therefore of the opinion that there was no violation of the Fifth Amendment in admitting this evidence.

"We are of the opinion that the action of the court below in refusing the motion to suppress the evidence was correct and that no constitutional rights of the defendant were violated by the admission of the evidence."

In MacFarland v. United States, 150 F2d 593 (CA DC Cir), the court approved a visual examination of the external parts of the body of the accused. With that type of examination I have no quarrel.

Using a catheter upon an unconscious accused is an entirely different proposition. A catheter is a tubular instrument which is introduced into the urethra for the purpose of drawing urine from the bladder. Ordinarily it is a somewhat painful experience, although it is unlikely that an unconscious person would suffer any pain. That, however, is beside the point. The real question at issue is whether or not an outside agency is justified in invading the sanctity of the human body without consent.

In considering the petition in the Rochin case, 342 US 165, 96 L ed 183, 72 S Ct 205, 25 ALR2d 1396, the Supreme Court said:

". . . The Supreme Court of California denied without opinion Rochin's petition for a hearing. Two justices dissented from this denial, and in doing so expressed themselves thus: '. . . a conviction which rests upon evidence of incriminating objects obtained from the body of the accused by physical abuse is as invalid as a conviction which rests upon a verbal confession extracted from him by such abuse. . . . Had the evidence forced from defendant's lips consisted of an oral confession that he illegally possessed a drug . . . he would have the protection of the rule of law which excludes coerced confessions from evidence.'

But because the evidence forced from his lips consisted of real objects the People of this state are permitted to base a conviction upon it. [We] find no valid ground of distinction between a verbal confession extracted by physical abuse and a confession wrested from defendant's body by physical abuse.'

. . . . .

". . . 'we must be deeply mindful of the responsibilities of the States for the enforcement of criminal laws, and exercise with due humility our merely negative function in subjecting convictions from state courts to the very narrow scrutiny which the Due Process Clause of the Fourteenth Amendment authorizes.' "

And here let me interpolate. We are not dealing with any appeal from a state court. There are no limitations upon our right to construe the Uniform Code of Military Justice and the Constitution of the United States. The language and reasoning of the Rochin case quoted below is particularly appropriate to the problem which now confronts us. Here is what the United States Supreme Court said in that case:

"Applying these general considerations to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

"It has long since ceased to be true that due process of law is heedless of the means by which otherwise relevant and credible evidence is obtained. This was not true even before the series of recent cases enforced the constitutional principle that the States may not base convictions upon confessions, however much verified, obtained by coercion. These decisions are not arbitrary exceptions to the comprehensive right of States to fashion their own rules of evidence for criminal trials. They are not sports in our constitutional law but applications of a general principle. They are only instances of the general requirement that States in their prosecutions respect certain decencies of civilized conduct. Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.' See Mr. Chief Justice Hughes, speaking for a unanimous Court in Brown v. Mississippi, 297 US 278, 285–286, 56 S St 461, 464–465, 80 L Ed 682. It would be a stultification of the responsibility which the course of constitutional history has cast upon this Court to hold that in order to convict a man the police cannot extract by force what is in his mind but can extract what is in his stomach.

"To attempt in this case to distinguish what lawyers call 'real evidence' from verbal evidence is to ignore the reasons for excluding coerced confessions. Use of involuntary verbal confessions in State criminal trials is constitutionally obnoxious not only because of their unreliability. They are inadmissible under the Due Process Clause even though statements contained in them may be independently established as true. Coerced confessions offend the community's sense of fair play and decency. So here, to sanction the brutal conduct which naturally enough was condemned by the court whose judgment is before us, would be to afford brutality the cloak of law. Nothing would be more calculated to discredit law and thereby to brutalize the temper of a society.

"In deciding this case we do not heedlessly bring into question deci-

sions in many States dealing with essentially different, even if related, problems. We therefore put to one side cases which have arisen in the State courts through use of modern methods and devices for discovering wrongdoers and bringing them to book. It does not fairly represent these decisions to suggest that they legalize force so brutal and so offensive to human dignity in securing evidence from a suspect as is revealed by this record. Indeed the California Supreme Court has not sanctioned this mode of securing a conviction. It merely exercised its discretion to decline a review of the conviction. All the California judges who have expressed themselves in this case have condemned the conduct in the strongest language.

"We are not unmindful that hypothetical situations can be conjured up, shading imperceptibly from the circumstances of this case and by gradations producing practical differences despite seemingly logical extensions. But the Constitution is 'intended to preserve practical and substantial rights, not to maintain theories.' Davis v. Mills, 194 US 451, 457, 24 S Ct 692, 695, 48 L Ed 1067.

"On the facts of this case the conviction of the petitioner has been obtained by methods that offend the Due Process Clause. The judgment below must be reversed."

Even stronger is the position of Mr. Justice Black and the language used by him. He says:

". . . I think a person is compelled to be a witness against himself not only when he is compelled to testify, but also when as here, incriminating evidence is forcibly taken from him by a contrivance of modern science."

We must remember that no complication involving any state sovereignty faces us here. This is a Federal case in every sense. In Adamson v. California, 332 US 46, the Supreme Court pointed out that the limitations imposed upon the states under the "due process" clause of the Fourteenth Amendment are much less rigorous than those which bind the Federal Government under the Fifth Amendment. There the court said:

"It is settled law that the clause of the Fifth Amendment, protecting a person against being compelled to be a witness against himself, is not made effective by the Fourteenth Amendment as a protection against state action on the ground that freedom from testimonial compulsion is a right of national citizenship, or because it is a personal privilege or immunity secured by the Federal Constitution as one of the rights of man that are listed in the Bill of Rights."

If such shocking conduct is prohibited to the states, which have much greater latitude of action under the Constitution than the Federal Government, then it most certainly is prohibited to the Federal authorities, and particularly in the military establishment where there are the additional protections of the Uniform Code of Military Justice.

In the Rochin case a stomach pump was used instead of a catheter. If anything, it seems to me that of the two, the use of the catheter would be the more reprehensible. Such an invasion of the inherent right of privacy of every human being is prohibited not only by the Fifth Amendment to the Constitution of the United States and by the provisions of the Uniform Code of Military Justice, but by natural and divine law as well. The precepts of natural law and the law of nature which long preceded the adoption of the Bill of Rights revolt at the practice approved by the majority in this case.

The theory of the law of nature arose in the ancient world, and was based upon eternal principles of law inherent in the nature of the universe itself. Man-made law was merely the affirmation of natural and divine law. Plato argued that absolute justice existed whether recorded by human experience or not. The Greek philosophers expounded the necessity of reconciling man-made laws with the law of nature. The same philosophies obtained throughout the Roman world. Cicero expounded these theories in De Legibus

**334**

in which he said that the binding quality of the civil law rose out of its harmony with the eternal principles of right and justice. He argued that man-made law was valid only when it did not conflict with the principles of right and justice; and that it would be impossible to make robbery or adultery, or falsification true law, by mere enactment.

In the middle ages natural law received universal recognition. The Roman Law as codified by the Emperor Justinian was only a reflection of the natural law. The Decretum, Gratian's Canonical Code of the 12th Century, was also based on natural law. In England in the 12th Century, John of Salisbury wrote:

> "There are certain principles of law which have perpetual necessity, having the force of law among all nations, and which absolutely cannot be broken."

In the 13th Century Henry de Bracton supported the same principles, and so did Sir John Fortesque, two centuries later, in his leading treatise, DeNatura Legis Naturae. Other exponents of the natural law were Roger Williams, Thomas Hooker, Hugo Grotius, the great Dutch authority on international law, John Milton, James Harrington, Algernon Sidney, John Locke, and the continental writers, Samuel Pufendorf, Emmerich Vattel, Jean Jacques Burlanoqui. These writers conceived a definite body of inalienable rights and privileges possessed by every individual in organized society. It was the state's duty to protect these rights, which were virtually immune from infringement, even by the Government, in the name of the general welfare.

The entire genius of our American institutions, the guarantees of the Bill of Rights, the protections of the Uniform Code of Military Justice, all combine to establish the truth of the aphorism "that a man's home is his castle." A fortiori then, these inalienable rights, which are implicit in the Law of Nature, and of Nature's God, demand that the sanctity of the human body, made in the image and likeness of God—the temple of his immortal soul— be and remain forever sacred and inviolate.