UNITED STATES, Appellee

v.

CECIL R. JONES, Private E–2, U. S. Army, Appellant

5 USCMA 537, 18 CMR 161

No. 4619

Decided March 18, 1955

Lt Col James C. Hamilton, U. S. Army, Maj Edwin Doran, U. S. Army, Capt Glade F. Flake, U. S. Army, and Capt Albert C. Malone, Jr., U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, Lt Col Thomas J. Newton, U. S. Army, 1st Lt Roderick V. Brown, U. S. Army, and 1st Lt Benjamin C. Flannagan, U. S. Army, for Appellee.

## Opinion of the Court

Robert E. Quinn, Chief Judge:

A general court-martial convicted the accused of wrongful use of morphine in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728, and sentenced him to a dishonorable discharge, total forfeitures, and confinement at hard labor for two years. The convening authority approved the findings, but modified the sentence by re-ducing the period of confinement and suspending execution of the discharge. A board of review affirmed. We granted review to consider the following issues:

1. Whether the evidence is sufficient to support the findings of guilty.

2. Whether the evidence regarding the specimens taken from the ac-

cused, and the tests and results thereof, was admissible.

While in confinement for an unauthorized absence, the accused was observed to be acting strangely. He was suspected of using narcotics. At the request of the Officer of the Day, he was taken to a local dispensary. The facilities for examination were inadequate, and the accused was asked if he objected to going to a station dispensary at Camp Drake. He agreed to go.

On arriving at the station dispensary, the accused was asked to provide a sample of his urine. He attempted to do so, but his efforts were unsuccessful. When all ordinary methods failed, a 1000 c.c. solution of glucose and water was injected intravenously. It does not appear, however, that this was done without the accused's consent. The injection also failed. Thereupon, catheterization was resorted to for the purpose of obtaining the required sample. This process was effective. The urine obtained was submitted to chemical analysis and revealed the presence of morphine.

Although the doctor who took the sample by catheterization said that he did not "hear the accused" state any objection, the medical attendant testified as follows:

"Q. How about any comments that he didn't want them to do that, did you hear something to that effect? A. They gave him a chance. They said he wasn't able to do it. They said he'd have to. He said he didn't like the doctor to run a tube . . . [into him].
"Q. That was a form of objection. A. Yes."

The accused's testimony regarding his objection is even more emphatic.

To force a person suspected of an offense to submit to an injection of over a quart of liquid into his veins in an effort to obtain evidence against him is highly questionable. However, in view of our disposition of this case, we need not decide that issue.

In United States v. Williamson, 4 USCMA 320, 15 CMR 320, a majority of this Court sustained the admission of evidence obtained by the use of a catheter when the accused was unconscious. The author of the present opinion protested against such an invasion of "the sanctity of the human body," and deprivation of an accused's constitutional rights. Although Judge Brosman joined Judge Latimer in approving the use of a catheter under the circumstances of the Williamson case, he expressly noted that "If the case . . . involved real evidence obtained from an accused . . . over his protest" he would regard it as a violation of "fundamental standards of decency," and a denial of military due process. The facts here clearly show that the instrument was employed not only without the accused's consent, but over his active protest. Consequently, the evidence is inadmissible.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside. Since the record does not show any available substitute evidence, the charges are ordered dismissed.

BROSMAN, Judge (concurring):

In United States v. Williamson, 4 USCMA 320, 15 CMR 320, I expressed it as my opinion that to extract a urine sample from a suspect by catheterization over his protest is without warrant in law. Since I find exactly this situation in the present record of trial, I have no choice but to hold that the Government's evidence was inadmissible.

No deviation whatever from my position in United States v. Barnaby, 5 USCMA 63, 17 CMR 63, is to be found in this concurrence. The difference lies simply in the methods employed by the investigators concerned. Nor is there anomaly in my close attention to methods. For instance, evidence obtained by means of a search conducted either by stealth or by force is generally held to be inadmissible—although the same evidence would be received without question, if it had been obtained through the use of a search warrant. Gouled v. United States, 255 US 298, 65 L ed 647, 41 S Ct 261.

The dissent concludes with the suggestion that "the ultimate solution is to first render the accused unconscious and then obtain the sample." In this connection I can only repeat once more my observation in the Williamson case— which dealt with the catheterization of an unconscious accused person—to the effect that "it is clear that no action of law enforcement personnel contributed to his [the accused's] insentience."

LATIMER, Judge (dissenting):

I dissent.

Since the majority opinion contains no developed concepts of law nor citations of authority, it is left for me to grope in the dark for the principles which might provide the basis for this departure from our previous holdings. Two possibilities are presented by the record in this case. Either the action here condemned is a violation of the privilege against self-incrimination, or it transgresses established "canons of decency and fairness" which protect the security of the person from violence. In neither area can there be found any support for this decision.

Whether the use of a catheter to obtain body fluid from an accused violates the privilege against self-incrimination in the military was supposedly laid to rest by this Court in United States v. Williamson, 4 USCMA 320, 15 CMR 320. To review that case ought to be unnecessary. Of significance for this discussion is the fact that the concurring judge in that case affirmatively stated the question did not come within the purview of the privilege against self-incrimination. To this, the dissenting judge apparently agreed, for he stated "the real question at issue is whether or not an outside agency is justified in invading the sanctity of the human body without consent." Therefore, a discussion of self-incrimination need not detain us here.

I am left then with the possibility that the holding is based on the principle that the evidence was obtained by methods which offend against the right of the person to be secure against violence and brutality. Before proceeding to the consideration of that point, I direct attention to our decision in United States v. Barnaby, 5 USCMA 63, 17 CMR 63. In that case we held that an accused may lawfully be ordered to produce a sample of his body fluid with all the sanctions of military discipline to back up the order. Necessarily, we there adhered to the view that an accused has no right to refuse to obey the order of military authority to furnish the specimen. Now, by some twist of logic, the accused, by verbally announcing he protests, can prevent the Government from using the evidence it has a right to demand. I know of only two reasons which can be relied upon to render this evidence inadmissible. Either its admission is objectionable because it is incompetent, immaterial or irrelevant or its admission is denied because the Government must be penalized for the methods employed in obtaining it. Surely this evidence was both competent and material, and the methods used to obtain it do not merit our condemnation.

Appellate defense counsel apparently believed that a reversal in this case could be bottomed on the brutality of the methods used here. In both oral argument and briefs they relied upon the case of Rochin v. California, 342 US 165, 96 L ed 183, 72 S Ct 205, and the author of the majority opinion has previously relied on that case to sustain the views he expressed in his dissenting opinions. For all practical purposes his dissents have now become the law of the Court and that result is reached in spite of the overwhelming civilian law to the contrary. In this instance, the record falls so far short of any showing of force or violence in obtaining the evidence that the Rochin case does not remotely support the holding. Especially is that true when it is borne in mind that the accused offered no objection to the first injection of glucose and water and said nothing to the doctor who performed the catheterization. Certainly we are not required to consider the taking of the accused's body fluid, after his statement that he did not like it, as a taking by violence. Undoubtedly he did not rejoice at the taking. In all probability, most suspected law

violators do not like being arrested, confined, searched, fingerprinted, having their blood removed by hypodermic needles, their urine by catheter, nor other body fluids by scientific means. In fact, it is not unknown for a serviceman to faint dead away either before or after an injection by a hypodermic needle. If use of those scientific methods of obtaining evidence be sufficient violence and brutality to bar testimony, then most Federal and state courts have failed to appreciate the inhumanities.

An examination of the decided cases is often helpful to the solution of a particular problem. The one undoubtedly most favorable to the accused is the Rochin case, supra. There, the United States Supreme Court reversed a conviction based on the receipt in evidence of two narcotic capsules which the police took from the defendant by forcibly holding him down, strapping him to a table and administering an emetic solution. The entire course of acquiring that evidence was marked by physical struggle, and the decision clearly was grounded on that fact. See the Court's reference to Brown v. Mississippi, 297 US 278, 80 L ed 682, 56 S Ct 461, and Malinski v. New York, 324 US 401, 89 L ed 1029, 65 S Ct 781. That the Supreme Court so evaluated its own decision can be shown by the language from a later Supreme Court opinion, Irvine v. California, 347 US 128, 98 L ed 561, 74 S Ct 381, where a majority of the court stated:

"An effort is made, however, to bring this case under the sway of Rochin v. California, 342 US 165, 96 L ed 183, 72 S Ct 205, 25 ALR2d 1396. That case involved, among other things, an illegal search of the defendant's person. But it also presented an element totally lacking here —coercion (as the Court noted, p. 173), applied by a physical assault upon his person to compel submission to the use of a stomach pump. This was the feature which led to a result in Rochin contrary to that in Wolf. Although Rochin raised the search-and-seizure question, this Court studiously avoided it and never once mentioned the Wolf Case. Ob-

viously, it thought that illegal search and seizure alone did not call for reversal. However obnoxious are the facts in the case before us, they do not involve coercion, violence or brutality to the person, but rather a trespass to property, plus eavesdropping."

A similar analysis of the case was made by the annotators in 25 ALR2d at page 1411:

"It should be emphasized that it was the totality of the picture of violence, compulsion, and illegality which moved the court to interfere in the Rochin Case, and that the majority opinion does not indicate that any of the components of that picture, standing alone, would necessarily transgress against the traditional notions of fair play which the federal courts must apply as a yardstick of due process. However, it would appear that Justice Frankfurter, at least, disapproved primarily of the shocking violence used by the police officers in making an illegal and forcible entry, seizing and choking the suspect, and forcibly injecting the emetic into his stomach, rather than of the more technical elements of self-incrimination and illegal search and seizure involved, and that the aim of the decision is to strike at illegal police, rather than court, practice."

The more recent state decisions offer even less support for the majority opinion here. See People v. Haeussler, 41 Cal2d 252, 260 P2d 8; Breithaupt v. Abram, 58 NM 385, 271 P2d 827; cases collected in United States v. Williamson, 4 USCMA 320, 15 CMR 320; and those annotated in 25 ALR2d 1407. And, in retreating from our previous holding, we erect unnecessary barriers to the presentation of most trustworthy evidence in a field which offers a difficult challenge to law enforcement agencies.

The record in this case shows that the accused was behaving strangely and was unable to speak clearly while confined in the guardhouse. He had gained the reputation of being a user of narcotics. He was taken to a battalion dispensary where puncture marks suggest-

ing recent use of a hypodermic needle were observed on his arm. He assented to a further physical examination at a better equipped dispensary within walking distance from the battalion area, and he voluntarily proceeded there. He did not protest to the medical officer about furnishing a sample of urine or being administered sugar and water intravenously to aid him in its passage, and the majority opinion dares not suggest that force was used to induce his submission to this procedure. After an hour and a half had passed and he was still either unwilling or unable to produce the desired sample, he, untouched and unassisted, lay on the table and allowed the doctor to proceed with the catheterization. No threats were uttered; no brutality, violence, force or physical coercion were used to require him to comply. Although he testified he expected the ordeal to be painful, he did not testify that his expectations were realized, nor was there other evidence to that effect. The process was carried out by a medical doctor whose skill was unquestioned and who used the sanitary and sterile measures required by good medical standards. I fail to find in those facts any legal grounds to complain that the reasons for withdrawing the fluid were chimerical or that the methods used were subject to social or legal condemnation for being unrighteous. When these facts are compared with those in the Rochin case, supra, I find they are poles apart, and I am not persuaded to hold that by using the scientific, modern, and medically approved methods to obtain evidence shown in this record, the Government has brought itself within the hypothesis of that decision. It is only when the Government seeks to take advantage of the wrong of its agents that it should be denied the right to use evidence; and here the doctor was authorized to order the accused to obey. His obedience was obtained without resort to force or violence and no steps were taken to expose him to physical harm if he did not submit. No disciplinary action need be taken here; and it will be soon enough to impose sanctions when the Government goes beyond its power to order an accused to comply. Because of the ramifications of this holding, I cannot pass up the opportunity to say that it is an anomalous legal doctrine which permits the Government to violate the person of an unconscious person and yet deny it the right peacefully to violate the person of one awake. I suppose the ultimate solution is to first render the accused unconscious and then obtain the sample.

Finding no transgression of the accused's rights, therefore, I would hold that the law officer did not abuse his discretion in admitting this evidence, and would affirm the decision of the board of review.