UNITED STATES, Appellee

v

EUGENE JORDAN, Airman Third Class, U. S. Air Force, Appellant

7 USCMA 452, 22 CMR 242

No. 8066

Decided January 4, 1957

*Captain George M. Wilson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley S. Butt.*

*Major John M. Rankin* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis P. Murray* and *Lieutenant Colonel Emanuel Lewis.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial in Japan convicted the accused of willful disobedience of an order to furnish a specimen of his urine to agents of the Office of Special Investigations, in violation of Article 90, Uniform Code of Military Justice, 10 USC § 890. He was sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for one year. Intermediate appellate authorities affirmed the conviction. We granted review.

On May 9, 1955, Special Agent E. R. Lisec of the Office of Special Investigations questioned the accused on his suspected use of narcotics. The accused was asked for a specimen of his urine for the purpose of submitting it to chemical analysis to determine the absence or presence of a narcotic. The accused refused to comply with the request. Thereupon, he was taken to his squadron commander, Lieutenant Colonel Thomas. On being apprised of the accused's refusal, Colonel Thomas gave the accused an order to the effect that "the next time he urinated he was to give the OSI a specimen of his urine." The accused informed the Colonel that he would not comply with the order. Asked to reconsider because he could be court-martialed for disobedience, he said "No, sir." He was then "excused."

The accused saluted Colonel Thomas. As he left the office, he heard Colonel Thomas tell someone to prepare "charge sheets." About five minutes later, while still in the custody of Agent Lisec, he went to the men's room. In the presence of the agent, he passed urine. However, he did not provide the agent with a sample. Four hours later, he was taken to the dispensary. He was given a physical examination, and again asked for a specimen of his urine. Once more he refused to provide it.

The first question for our consideration is whether Colonel Thomas' order is legal. An order which contravenes the fundamental protections accorded to an accused by Article 31, Uniform Code of Military Justice, 10 USC § 831, is illegal. United States v Greer, 3

**453**

USCMA 576, 13 CMR 132; United States v Rosato, 3 USCMA 143, 11 CMR 143. In part, Article 31 provides that no person subject to the Code "may compel any person to incriminate himself."

In several previous cases we considered the general problem of obtaining a urine specimen from a ▌ person suspected of wrongful use of narcotics. Our initial views were set out in United States v Williamson, 4 USCMA 320, 15 CMR 320. Each judge approached the problem from a different viewpoint. With the author of present opinion dissenting, Judge Latimer and the late Judge Brosman concluded that a urine specimen extracted from the body of an unconscious accused by means of a catheter was admissible as evidence. On the same day the Court decided United States v Booker, 4 USCMA 335, 15 CMR 335. There, we unanimously agreed that a urine specimen obtained from an accused with his consent and full cooperation is admissible. During the next term of Court, we decided United States v Barnaby, 5 USCMA 63, 17 CMR 63, and United States v Jones, 5 USCMA 537, 18 CMR 161. In the Barnaby case, the accused was arrested by a Criminal Investigation Detachment agent and taken to an Army hospital for a physical examination. A noncommissioned officer ordered the accused to urinate into a bottle which he handed to him. The accused complied. With the author of the present opinion dissenting, Judges Latimer and Brosman agreed that the order did not violate Article 31. In the Jones case, however, Judge Brosman joined the author in setting aside the accused's conviction. In that case the accused was asked to provide a sample of his urine. He tried, but failed. Over his protest, an Army doctor obtained a specimen by catheterization.

Here, the Government has attempted to reconcile the Barnaby decision with that in the Jones case on the ground that an order to provide a urine sample constitutes merely a "moral sanction to achieve a legitimate end." The force of an order by a superior officer can hardly be equated to a moral sanction.

On the contrary, it is a tremendously powerful force in military law. In time of war, a willful refusal to obey is punishable by death. Article 90, Uniform Code of Military Justice, 10 USC § 890. In time of peace, it carries a penalty even greater than that for desertion with the intent to remain away permanently. Manual for Courts-Martial, United States, 1951, paragraph 127c, Section A, page 220. However, we need not elaborate. Neither need we consider the Government's attempted justification of the rationale, or the effect of Judge Brosman's views. Suffice it to say that, in our opinion, to compel a person against his will to produce his urine for the purpose of using it, or an analysis of it, as evidence against him in a court-martial proceeding, violates Article 31 of the Uniform Code.

The use in a criminal proceeding of a urine specimen obtained from an accused against his will has received the direct attention of the Federal courts in only a few reported instances. The cases are not definitive, but they tend to support our conclusion. In Bratcher v United States, 149 F2d 742 (CA 4th Cir) (1945), cert den 323 US 885, 65 S Ct 1580, 89 L ed 2000, pursuant to his draft board's order, the defendant was given a regular preinduction physical examination. As part of the examination, he was required to, and did, provide a sample of his urine. On analysis, it was determined that the urine contained benzedrine, a drug which has the effect of increasing the blood pressure. The defendant was then indicted for evading service under the Selective Training and Service Act by wrongfully presenting himself for induction while in an abnormal physical condition which resulted from his knowing use of the drug.

Before trial, the defendant moved to suppress the evidence of the urinalysis. He contended that his urine had been obtained under circumstances which violated his rights under the Fourth and Fifth Amendments of the United States Constitution. After a hearing at which evidence was taken, the trial court denied the motion. It held that the defendant had "totally failed" to show that the object of the physical

454

examination was to secure evidence to. be used against him in a criminal prosecution. The Court of Appeals for the Fourth Circuit unanimously affirmed. It pointed out that the urine sample was obtained as part of the regular induction process under the Selective Training and Service Act and the regulations thereunder, and that "there was no evidence offered to show that the authorities intended anything other than to comply with the regulations and induct the defendant if he was found acceptable." Ibid, page 745.

Significantly, both the trial judge and the Court of Appeals in the Bratcher case believed it was important to determine whether the urine sample had been obtained from the accused as a mere incident of the induction procedure or for the specific purpose of obtaining evidence for the use against him in a criminal proceeding. See United States v McGriff, 6 USCMA 143, 19 CMR 269. The inquiry and the ground of their decision indicate that if the defendant had succeeded in showing that the urine specimen was taken without his consent and for the purpose of using it as evidence, both tribunals would have held the urinalysis to be inadmissible.

In United States v Nesmith, 121 F Supp 758 (DC DC) (1954), the defendant also contested the admissibility of the results of an analysis of a urine specimen obtained from him by police officers. In pertinent part, District Judge Holtzoff said:

"Rochin v. People of California, 342 U. S. 165, 72 S Ct 205, 210, 96 L. Ed. 183, on which defense counsel relies, is not in point, as it dealt with an entirely different principle. The case was decided under the due process clause of the Fourteenth Amendment, and did not involve the privilege against self-incrimination under the Fifth Amendment. In that case, local deputy sheriffs receiving information that the defendant was selling narcotics, broke into his room. He immediately seized two capsules and put them in his mouth. A struggle ensued, in the course of which the officers attempted to extract them.

After these efforts proved unavailing, he was immediately taken to a hospital and a stomach pump was forcibly applied to him against his will. As a result the two capsules were vomited by the defendant. . . . *The principle of this case would be applicable here if force had been exerted or threats made to compel the defendant to comply with the demand for a specimen, or if some instrument had been forcibly applied to his body in order to obtain it."* [Italics supplied.]

Although the quoted part of Judge Holtzoff's opinion is dictum, it supports the conclusion that a urine specimen obtained from a person by force or threat, or the unauthorized intrusion of an instrument in his body, for use against him in a criminal proceeding, is inadmissible. As we previously pointed out in this opinion, the force of a military order by a superior officer is one of the strongest known to military law. We hold, therefore, that the order here was illegal. To the extent that United States v Barnaby, supra, is inconsistent with this decision, I would overrule it. However, Judge Ferguson, who joins me in the result in this case, does not choose to go that far. His views are expressed in his separate opinion.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside, and the charge is ordered dismissed.

FERGUSON, Judge (concurring in the result):

I concur in the result but because of the importance of the issue before us and prior rulings in this area I feel that certain aspects of the case should be emphasized.

The question before the Court is whether an order to a subordinate to furnish a urine specimen to be used as evidence in a criminal prosecution, is a lawful command within the meaning of Article 90 of the Uniform Code of Military Justice, 10 USC § 890. The issue is not the admissibility of the evidence so obtained, but rather the le-

gality of the order. It is important for purposes of analysis to remember that the first clause of Article 31(a) of the Code, 10 USC § 831, that "No person subject to this chapter may compel any person to incriminate himself" and Article 90, violation of a lawful command of a superior officer, have no counterpart in civilian practice. Civilian courts have never ruled on the question of the legality of an order requiring a person to incriminate himself and making it a criminal offense not to obey that order. Therefore, I am not as positive as the dissent, as to what the "Judges of the Supreme Court of the United States, the judges of the other courts referred to in our previous decisions, and the framers of the American Law Institute's Model Code of Evidence" would hold were they faced with the same problem. The courts have many times ruled on evidence problems in dealing with the Fifth, Fourth and Fourteenth Amendments to the Constitution but that problem is not involved here. The problem now before us is simply whether an order by a superior to submit a urine specimen for the sole purpose of obtaining incriminating evidence against the accused violates Article 31(a) and is, therefore, illegal.

Paragraph 2 of Article 90 of the Code is directed toward "Any person subject to this chapter who . . . willfully disobeys a *lawful* command of his superior officer." (Emphasis supplied.) Article 90 is essential to the successful operation of the military establishment. However, this Article does not make disobedience to all orders of a superior officer punishable by courts-martial. Clearly, Congress did not intend that the disobedience of unlawful orders should be punishable. "A person cannot be convicted under this article if the order was illegal." Paragraph 169*b*, Manual for Courts-Martial, United States, 1951. (In this connection it is interesting to note that during the trial of the war criminals, recognition was taken of the fact that in wartime not *all* commands of superior officers relieved the defendants from their criminal accountability.) Turning then to the problem before us in this case, the accused argues that the order

to give a specimen of his urine was illegal. Our inquiry, therefore, must be directed as to whether or not the Code contains a provision which would make the command to furnish a specimen of urine unlawful and hence not punishable. Article 31(a), supra, provides that "No person subject to this chapter may compel any person to incriminate himself *or* to answer any question the answer to which may tend to incriminate him." (Italics supplied.) Logically the use of the disjunctive "or" in connecting the words "incriminate himself" and "to answer any question" indicates a difference between the two phrases. This difference is that the first part refers to any type of "compelled" incrimination, whereas the second refers to testimonial evidence described in sections (b) and (d) of the Article. The first portion of 31(a) has to do with compulsion upon the part of any person subject to the Code, whereby a person is compelled to incriminate himself. This is not a limitation to only testimonial utterances, it is all inclusive. The second part of Article 31(a) carries a limitation to answering any question, i. e., testimonial utterances. If the first part of Article 31(a) means anything, it means that a superior officer cannot compel a man subject to the Code to give a specimen of his urine to be used to convict him of an offense under the Code, or suffer the penalties of an offense under Article 90 of the Code, supra, which offense in time of war carries the death penalty. Certainly it could have been reasonably concluded by the accused that the order to give a specimen of his urine would incriminate him. To my mind the order to furnish a urine specimen under these circumstances falls within the prohibition of Article 31(a).

The question of whether an order is lawful or not, for the purposes of an Article 90 prosecution, is a problem different from that of the admissibility of evidence under the evidentiary portions of Article 31(d). The two should be separately considered. In holding an order unlawful, the question of admissibility of evidence which might be obtained as a result of such an order is still open and is to be determined by

applicable rules of evidence in each particular instance. As far as incrimination here is concerned, it is obvious that in any case where the object of the order is to obtain evidence to be used in a prosecution such order is illegal.

It has been suggested that this opinion is inconsistent with United States v Williamson, 4 USCMA 320, 15 CMR 320, and United States v Barnaby, 5 USCMA 63, 17 CMR 63. However, as I read those cases, both involve the *admission of urine specimens into evidence*. In the first case no order was involved. The late Judge Brosman in *obiter dictum* declared that he was satisfied a suspected person could be ordered to furnish urine samples for chemical analysis. Judge Latimer, the organ of the Court in the Barnaby case, supra, asserted that the holding in Williamson, supra, was dispositive of that issue in Barnaby, quoting Judge Brosman's dictum. I do not agree with the above dictum in the Williamson case, nor with Judge Latimer that it was dispositive of the issue in Barnaby. To my mind the holding of the Williamson case was concerned with the application of the doctrine of Rochin v California, 342 US 165, 72 S Ct 205, 96 L ed 183, as a due process question operating in the military through the Fifth Amendment. I express no further views here on that subject except to point out that it does not seem applicable to the case at hand. The Barnaby case involves introduction of evidence, and, to my way of thinking, should have been resolved by consideration of the applicable rules of evidence, e.g., Article 31(d), paragraph 152, Manual for Courts-Martial, supra, with perhaps consideration given to the Rochin doctrine operating through the due process provisions of the Fifth Amendment. In any event, I would not involve myself in the circuity of reasoning implicit in the determination that evidence compelled by an order is admissible; the order being legal if such evidence is admissible, viz., nontestimonial.

In the instant case no such reasoning is needed. Article 31(a) announces that no person shall compel an individual to incriminate himself. An order by a superior officer is compulsion in a case such as this when the order is given with only one end in mind, i.e., to obtain incriminatory evidence against the accused. It violates the express prohibition of Article 31(a) and is unlawful. It follows, as night the day, therefore, that if—in an Article 90 prosecution—the order in question is unlawful the prosecution must fall.

The crime for which the evidence was to be obtained in this case is indeed a serious one and all legal means should be adopted to secure convictions to stamp it out. No doubt some guilty persons have escaped punishment as a result of Constitutional protections and by guarantees similar to Article 31 of the Code, but as a Nation we adhere to a philosophy of government by laws, not men. I fail to see how the heinousness of dope crimes and the resulting thought of "most forward-thinking persons" is germane to the case here where no evidence with respect to the accused's use of dope was ever in fact obtained unless, of course, we desire in dope cases to commence with a presumption of guilt. I think perhaps that some of the language used by the Court of Appeals in United States v Gordon, 236 F2d 916 (CA 2d Cir) (1956), is apropos:

"3. The government urges that a decision sustaining the privilege in a case like this will seriously impair the utility of every future grand jury investigation as a means of obtaining evidence with which to indict and convict criminals. That argument cuts too far: It would yield the patently illegal repeal by judges of the constitutional provision guaranteeing the anti-self-incrimination privilege. That provision unquestionably does sometimes impede enforcement of the criminal laws. But that was one of the clear purposes of the constitutional privilege, i.e., to prevent a court from compelling a witness—who might or not be a criminal—to give testimony which might incriminate him. All privileges not to testify have the same impeding effect. This fact was emphasized by Bentham, the first doughty foe of the anti-self-incrimination privilege.

**457**

He depicted it as an absurd interference with the expeditious punishment of criminals. But, on the same grounds, he argued for the abandonment of the client-lawyer privilege. Yet few today want that privilege abandoned, although it enjoys no explicit constitutional protection.

"What the government contends with respect to the Fifth Amendment privilege applies with equal force to the immunity, from unreasonable searches and seizures, guaranteed by the Fourth Amendment. It, too, often becomes a barrier to crime investigation, as when evidence slips away because the police may not promptly search without a warrant.

"American prosecutors must learn to adjust themselves to these obstacles. The purpose of the Bill of Rights was, as Madison declared, ' "to oblige the government to control itself." ' We are committed to the principle that any method of pursuing suspected criminals must give way when it clashes with these constitutional guarantees. The framers of the Constitutional Amendments thought those guarantees embodied an even more important policy than that of detecting and punishing crime. Considered solely in terms of procedure, those constitutional safeguards seem logically indefensible. Considered, however, as conferring substantive rights, they assume a different significance: They express the high value our democracy puts on the individual's right of privacy. 'Traditionally, Anglo-American law values the individual's life and freedom so highly that the interest of the state in discovering and punishing wrong-doers is subordinated to the right of the accused to remain a passive spectator of the fact of his wrongdoing.' "

Centuries of experience have taught us that in order to be free, provisions such as the Fifth and Fourth Amendments to the Constitution and the guarantees of due process are essential. In this instance we are governed by the Congressional mandate of Article 31 of the Uniform Code. Its meaning is clear

**458**

and unequivocal, and, in my opinion, should not be changed by judicial legislation.

LATIMER, Judge (dissenting):

I dissent.

My views on this subject may be found set out in United States v Williamson, 4 USCMA 320, 15 CMR 320; United States v Barnaby, 5 USCMA 63, 17 CMR 63, and allied cases, and they need not be repeated here. However, they no longer speak the law for the military service, for the doctrine announced therein is overruled by the holding here, regardless of the reservations found in the present opinions.

One of the reasons advanced for overturning those principles seems to be founded on the notion that some sort of obscure distinction may be drawn between this case, which involves the legality of an order, and a case where the question concerns the admissibility of evidence. I fail to see the refinement, for Article 31 has been interpreted to prohibit the introduction of evidence which is obtained in violation of any of its provisions, and it is difficult to support an argument that an enlisted man who furnishes a urine sample under threat of punishment for violating an order has not been coerced. A person placed in a situation where he must comply with an order or face prosecution for a serious offense is not left with a free choice, and one need not be unusually discerning to sense a great deal of pressure in this situation. The sole question in this case, then, is the legality of the means of coercion employed, which, in turn, depends upon whether the order given violated the terms of Article 31. It is true that in Barnaby, the accused obeyed the order given to him and furnished a urine specimen. The specimen was tested and the test result was offered by the prosecution as evidence. But as I understand the law, the accused must claim his constitutional or statutory right against self-incrimination or it is waived, and the appropriate time to raise the issue is when the evidence is first offered. In Barnaby, the issue was not waived and was raised

when the evidence was first offered. Once raised, the question of whether this evidence was admissible depended upon the lawfulness of the order which brought forth the sample; once again the ultimate issue was whether Article 31 had been violated by the giving of the order. Therefore, the conclusion is inescapable that, at the very least, the principles announced in United States v Barnaby, supra, are no longer the law.

Orders given by military superiors are presumed to be legal and anyone who refuses to obey a command does so at his peril. Here the accused was ordered to furnish a urine specimen and the burden was cast upon him to overcome the presumption of legality. That burden would be carried in this case if compliance with the order would have compelled him to incriminate himself as that term is understood in law. However, if the order did not require him to do that, then it was proper and the conviction must stand. Hence the fundamental issue in this case is the scope of the phrase "compel any person to incriminate himself." Some consideration must be given to the meaning of each word, including the last.

The reported cases bear evidence that the question is not without difficulty, but I had thought we laid down a good working rule in United States v Rosato, 3 USCMA 143, 11 CMR 143, United States v Eggers, 3 USCMA 191, 11 CMR 191, and United States v Greer, 3 USCMA 576, 13 CMR 132. In those cases we held that an accused could not be required to perform an act which required active participation and affirmative conduct in the production of incriminating evidence. It is apparent from our holding in those cases that we did not then believe that such acts as compelling a person to submit his body for physical examination, to furnish blood samples, to submit to fingerprinting, to deliver up contraband property, or to surrender the tools of the crime, fell within the proscription of either the Constitution or Article 31, because the evidence could be obtained with only passive cooperation on the part of the accused. Later, in Barnaby, supra, we held that compelling an ac-cused to furnish a urine sample was akin to the enumerated classes and, therefore, not in contravention of law. To illustrate the distinction, I can do no better than quote from the late Judge Brosman's concurring opinion in United States v Williamson, 4 USCMA 320, 15 CMR 320. There he stated (page 329):

"Both handwriting samples and spoken words—the evidentiary items involved in Rosato, Eggers, and Greer, cited by my brothers—involve a creative performance on the part of the accused. Without his conscious affirmative action, they can never exist; they could not possibly be—apart from a positive exercise of will by him. Conceivably the accused might live out the remainder of his life without either speaking or writing — although admittedly the prospect would not be happy. The creation of urine, on the other hand, eventuates apart from any sort of effort of will, and involves only involuntary and unavoidable physiological functions. In this sense, therefore, no 'creativeness' is essential to the formation or discharge of this fluid. The conscious mind controls only the time and place of essential disposal. Accordingly, I am sure that—unlike the rule in the situations involving handwriting and voice exemplars—a person suspected on reasonable grounds may lawfully be required by an order from superior authority to furnish urine samples for chemical analysis."

The rationale therein expressed may be further highlighted by suggesting a slightly different version of the order given here. If we assume that the officer had ordered the accused to use a certain receptacle when it became necessary to void his urine, would that order be illegal because it compelled him to incriminate himself? If so, then ordering a person to channel his blood sample into a test tube would also be illegal. I could go on ad infinitum, but I believe my point is clear.

I agree that experience has taught us that retention of the guarantees found in the Constitution and the Code

is essential. But I do question an extension of the law to cover a situation not within the contemplation of the framers of the Constitution or the members of Congress who enacted the Uniform Code of Military Justice. Moreover, I am certain that the Judges of the Supreme Court of the United States, the judges of the other courts referred to in our previous decisions, and the framers of the American Law Institute's Model Code of Evidence were well aware of those guarantees when they concluded that the compulsory performance of certain acts fell without the purview of constitutional guarantees.

Being faced with a choice, I prefer their reasoning and the results they reach to the conclusion of my associates. In addition, I mention that while Congress and most forward-thinking persons are striving valiantly to control the traffic in habit-forming drugs, we appear to be taking a step backward in denying to the Services a valuable and legal means of controlling a most despicable offense. Most important of all, if the sweep of the concurring opinion is as broad as it appears to me, then crime detection in the Services will be unnecessarily stifled.