**The COMMITTEE FOR G. I. RIGHTS et al., Plaintiffs,**

v.

**Howard H. CALLAWAY, Secretary of the Army, et al., Defendants.**

**Civ. A. No. 835–73.**

United States District Court, District of Columbia.

Jan. 14, 1974.

David F. Addlestone, American Civil Liberties Union, Washington, D. C., for plaintiffs.

Michael Katz, Asst. U. S. Atty., Captain Royce C. Lamberth, Washington, D. C., for defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

This is a class action brought on behalf of all G.I.'s attached to the United States Army's European Command. Plaintiffs claim that certain features of a drug abuse prevention plan developed by the Army for that command are unconstitutional and they seek a declaratory judgment and injunctive relief.

The issues have been narrowed and clarified during several pretrial proceedings. Plaintiffs have abandoned damage claims. The Army published a revised comprehensive statement of the plan on September 10, 1973, which reflected a reevaluation of the program and coincidentally satisfied some objections previously urged by plaintiffs. The plan as now before the Court is embodied in an elaborate circular designated as USAREUR Circular 600–85 (Sept. 10, 1973),[1] and the litigation has focused on certain clearly identifiable provisions in that document. The parties have filed affidavits and briefs and the case is before the Court after full oral argument on cross-motions for summary judgment. The pertinent facts are not in dispute, although the legal positions of the parties are in sharp conflict.

The original complaint filed in April, 1973, was somewhat diffuse and raised a variety of issues reflecting the uneven manner in which the drug program had been administered in its early stages and uncertainties caused by some confusion in the implementing directives. Defendants at that stage properly opposed certification of the alleged class. In view of the pretrial development mentioned, however, certification under Rules 23(b)(2) and 23(c) of the Federal Rules of Civil Procedure is now appropriate. The named plaintiffs have ably represented the class, joinder of some 145,000 G.I.'s is impractical, the challenged plan, as clarified, is applicable to the entire class, and common issues of fact and law can be readily identified and can be most efficiently adjudicated in a single action. The class will be certified as representing all soldiers in the European Command with ranks of E–1 through E–5 who are subject to the drug provisions of Cir. 600–85.[2]

The USAREUR drug prevention plan is designed to identify drug pushers and users, to provide users with medical assistance, counselling and other support directed toward rehabilitation, and, where rehabilitation fails, to eliminate confirmed drug users from the service. The program is directed against use of both hard and soft drugs. In broad outline, the authorizing circular in pertinent part contemplates the following procedures.

A soldier enters the USAREUR drug program when he is either "suspected" of drug abuse or "identified" as a drug abuser. Suspicion may be established by such vague criteria as "unexplained changes in job performance, behavior, or

---

1. Hereinafter cited as Cir. 600–85.

2. The Court takes notice of the fact that Cir. 600–85 authorizes virtually identical procedures for the detection and rehabilitation of alcohol and drug abusers. The holding of the Court is, of course, limited to the drug aspects of the circular, since plaintiffs have not challenged the USAREUR alcohol program. However, since many of the findings below apply with equal force to the treatment of alcohol abusers, the Army is urged to take the rights of this group into account in bringing the circular into compliance with this Opinion.

physical condition related to the use of . . . drugs" or the frequenting of known drug sales points. Cir. 600–85, ¶ 7a. Identification is based upon reliable witness reports or possession of drugs. Cir. 600–85, ¶ 8a. Possession may, in turn, be established through the use of special drug inspections of individual billets as well as public areas.

The Army drug inspection has developed over the past few years and is specifically authorized under the new plan. *See* Cir. 600–85, Annex I (3, 4). Inspectors are permitted to examine all of the soldiers' property (although they may search personal items such as wallets only cursorily in order to determine the presence of contraband), their clothing and even their entire exterior skin area for drugs or indications of drug use. All inspections are to be conducted without undue harassment, in the presence of those whose property is under examination, and, in the case of skin searches, with as much privacy as is possible. Groin or anal inspections must be conducted by qualified medical personnel in complete privacy. Drug detector dogs may be used throughout the inspection process. Cir. 600–85, Annex C (5).

When a soldier is identified as a possible drug user, whether on the basis of an inspection or otherwise, he is subject to mandatory drug processing. Cir. 600–85, ¶¶ 7–13. He is first confronted by his Commanding Officer, who informs him of the basis for the identification, warns him of his rights, and permits him to provide relevant information to dispel the suspicion. The Commander may then refer the soldier to a Community Drug and Alcohol Assistance Center (CDAAC). If the Center finds credible evidence of drug abuse, it must send the soldier to a Medical Treatment Facility (MTF) for clinical evaluation. Counsel is provided during the MTF interviews, if requested.

Prior to medical confirmation of drug abuse by the MTF, no disciplinary or rehabilitative measures may be taken except for the temporary suspension of access to classified material, the loss of flight status, the suspension of nuclear duty, and, if the soldier has been involved in an automobile accident, the temporary suspension of his driver's license. Cir. 600–85, ¶ 14d(3).

Once a soldier has been designated a "confirmed drug abuser" by the MTF, however, a variety of restrictive sanctions may be imposed. The MTF will either admit the soldier to a hospital or return him to CDAAC for development of a 60-day rehabilitation program, which may include urine and other testing, treatment, and counselling at a variety of drug facilities. In addition, the Commander may elect to impose one or more administrative sanctions, including temporary withdrawal of pass privileges and/or suspension of a driver's license without hearing. Medically confirmed drug abusers may be required to move onto the base (even if billeted with wife and family off base) and may be segregated into a separate section of the barracks. Cir. 600–85, Annex J.

By the end of the 60-day period, the Commander must determine whether or not the drug abuser is a "rehabilitative success." If not, he must be processed for administrative discharge under circumstances that may adversely affect his military record. If his rehabilitation is deemed satisfactory, he may be returned to normal duties but will be subjected to 300 days of follow-up testing and observation, including unannounced urinalysis testing twice a month. The effects of this processing, including preclusion from promotion and the stigma of having been labeled a confirmed drug abuser, may continue long after even the follow-up period has terminated successfully.

When rehabilitation fails, a confirmed drug user may be separated under other than honorable conditions, and the circular permits military authorities to advise prospective employers, Government or civilian, of the soldier's drug involvement. Moreover, under varying circumstances that need not be detailed, the circular contemplates use of facts devel-

oped as a result of the identifying and rehabilitative process as evidence in court martial trials. Thus, the program combines rehabilitation with the prospect of strict disciplinary action when deemed appropriate by the Army.

An analysis of this drug program reveals serious constitutional infirmities when measured against established civilian standards. The special drug inspections authorized without probable cause are made in a most intrusive manner solely to ferret out drugs and are not analogous to the Army's traditional preparedness inspections. *Compare with* United States v. Lange, 15 USCMA 486 (1965); United States v. Grace, 19 USCMA 409 (1970). Such distinguishing features as the use of dogs, strip skin examinations and detailed intrusion into a soldier's personal effects take this procedure out of the narrow exemption from traditional Fourth Amendment restrictions that has been carved out for legitimate inspections. *Compare* United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L. Ed.2d 87 (1972), *with* Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). The drug inspection described above constitutes a mass search, and would be illegal in a civilian context if conducted in the absence of particularized probable cause. *See* Lankford v. Gelston, 364 F.2d 197

(4th Cir. 1966). Moreover, the subsequent use for disciplinary purposes of facts developed during such a search or during participation in a rehabilitative program ordered by reason of an illegal search would be equally improper. The fruits of an initial illegality cannot be used to punish. Wong Sun v. United States, 371 U.S. 471, 487–488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In fact, since the rehabilitative program contemplated by the circular itself entails intrusive searches and interrogation, information obtained during drug processing could not be used for disciplinary purposes unless the Army had probable cause, obtained independently of that processing, to believe that a particular soldier was guilty of drug abuse.[3]

The circular also provides for the imposition of numerous administrative sanctions without hearing. These sanctions may restrict the immediate liberty of the soldier, reduce his eligibility for promotion, taint his military record, and lead to forms of discharge carrying a serious stigma affecting his future civilian status. Such sanctions are serious and often are not dictated by emergency health or safety concerns, so the complete absence of a hearing in any form [4] offends due process. *See* Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.

3. It is arguable that both individual rights and the detection and rehabilitation of drug abusers could be maximized by a total ban on the use in punitive proceedings of any information obtained during the drug processing described in paragraphs 7 through 13 of the circular. The Senate adopted just such a prohibition in 1971, *see* H.R. 6531, 92d Cong., 1st Sess., 117 Cong.Rec. 22411–12 (1971), but it was dropped by a conference committee on the principal ground that such an important step required further study of the constitutional, statutory and evidentiary principles involved. *See* Conf.Rep.No.433, 92d Cong., 1st Sess. (1971). The record in the instant case is similarly insufficient to permit judicial resolution of these complicated issues, and no such resolution is required by the pleadings. Since plaintiffs have attacked this aspect of the drug program sole-

ly on Fourth Amendment grounds, the Court may properly limit its consideration to those soldiers who are forced to participate in the program on the basis of illegally obtained evidence or of suspicions which do not rise to the level of probable cause.

4. The confrontation presently guaranteed by the circular, *see* p. 3 *supra*, coming as it does before confirmation of drug abuse and long before a rehabilitation program is developed, offers the accused soldier no opportunity to challenge the sanctions eventually applied. The formal complaint procedures available to soldiers are normally unavailable until after administrative sanctions have been imposed, and so do not satisfy the requirements of due process. Bell v. Burson, 402 U.S. 535, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).

Ed.2d 556 (1972); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

There is no need to elaborate on these constitutional infirmities in detail, for the law has been well defined in these areas and, indeed, defendants have not seriously quarrelled with this analysis. They assert, however, that because of military necessity they need not comply with constitutional safeguards otherwise applicable.

■ ■ At the very outset of these proceedings, and continuously thereafter, the Army has interposed its claim of military necessity. It urges that the USAREUR drug abuse program is required to prevent serious impairment of morale and discipline and that, accordingly, under the well-established doctrine enunciated in such cases as Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), and United States v. Jacoby, 11 USCMA 428 (1960), the constitutional rights of soldiers affected by the program must be judicially determined to be inapplicable under these circumstances. The Army has the burden of establishing military necessity, however, and it has failed to do so.

■ ■ The doctrine of military necessity does not embrace everything the military may consider desirable. One does not automatically forfeit the protections of the Constitution when he enters military service. The constitutional rights of a G.I., including his privacy, may not be infringed except to the extent that the military can demonstrate by concrete proof an urgent necessity to act unconstitutionally in order to preserve a significant aspect of discipline or morale. The present drug program, which also applies to alcoholics, arose not solely from some military situation encountered in the field but rather represents the Army's effort to implement a congressional statute. In 1971, Congress directed the Secretary of Defense to "prescribe and implement procedures, utilizing all practical available methods . . . [to] identify, treat, and rehabilitate members of the Armed Forces who are drug or alcohol dependent persons. . . ." Pub.L. No. 92–129, Title V (Sept. 28, 1971). This statute provided the primary legal basis for the Army's action in establishing the program here under review. An examination of the language and legislative history of this and related statutes demonstrates that Congress at no time intended to authorize the military to proceed with a drug/alcohol program in disregard of fundamental constitutional safeguards. Indeed, its focus has been entirely upon treatment, not punishment. See Pub.L. No. 92–129 (Sept. 28, 1971); 21 U.S.C. §§ 1101–1191; H.R.Rep.No.775, 92d Cong., 2d Sess. (1972). See also note 3 supra.

The Army sought to support its claim of military necessity by referring to information indicating the extent of the drug problem in the European Command. Surveys of drug abuse since 1970 reveal a fairly stable level of daily drug use: ten to fifteen percent for cannabis and one to two and one-half percent for other drugs. There are no reliable statistics with respect to addiction, and the Army's claim of increasing drug use is subject to serious question because of changes in testing procedures. It is certainly clear that drug use in the Command has not reached anything comparable to the epidemic proportions detected in Vietnam and is not particularly different from drug use encountered among civilians in major United States cities. See generally Defs.' Ex. 2.

■ Even this limited extent of drug involvement within the Command creates a situation which obviously requires attention and perhaps even limitation of the constitutional rights of particular troops in highly sensitive duty assignments, but it does not reflect the type of urgent and generalized threat to military morale or discipline which would warrant ignoring constitutional safeguards as to everyone in this large Command.

The difficulty with the circular, as plaintiffs repeatedly point out, is that it attempts to deal with the drug abuse problem not only as a health problem, as Congress intended, but also as a disciplinary problem. The Army has, since 1970, moved gradually in the direction of rehabilitation rather than discipline in dealing with medical problems such as drugs, alcohol, personality disorders, and the like, but it has not foreclosed its punitive options. While the Court can see nothing unreasonable in conducting intrusive searches without probable cause for the sole purpose of placing individuals into a medically oriented drug rehabilitation program, or with placing soldiers merely suspected of drug abuse into such a program, the USAREUR drug plan is not so limited. Far more than reasonable health monitoring precautions are involved. *Cf.* Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971). Information developed for medical purposes can be used in court martial proceedings, to impose strict administrative sanctions, and to justify an unfavorable discharge which will follow the G.I. for the rest of his life.

In the absence of a showing of military necessity, illegal searches and the imposition of penalties and other discipline without fair hearing cannot be permitted. Inspections without probable cause undertaken for the specific purpose of identifying drug users which involve the use of dogs, strip searches, examinations of body cavities and the most intimate inspection of a G.I.'s most private belongings cannot be justified under any circumstances unless the results of such inspections are confined to medical treatment of the drug abusers so identified. Soldiers forced into the rehabilitation program on mere suspicion must be protected against discipline or unfavorable discharge based on information developed during medical processing. Moreover, failure to provide a hearing prior to the imposition of non-medically oriented administrative sanctions which significantly affect a G.I.'s

liberty or property is constitutionally unsupportable.

Two other aspects of the USAREUR drug plan can be dealt with summarily. First, the provisions permitting dissemination of drug information to non-military government agencies and even, under more limited circumstances, to civilian applicants are in direct conflict with 21 U.S.C. § 1175, through which Congress sought to protect from stigma those who entered federal drug programs. *See* H.R.Rep.No.775, 92d Cong., 2d Sess. (1972). Defendants argue that this statute was not intended to apply to the Army, but the Special Action Office for Drug Abuse Prevention, an agency set up to administer the statute, has ruled otherwise, *see* 37 F.R. 24636–37 (Nov. 17, 1972), and its reasoning is persuasive. *See* Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L. Ed.2d 616 (1965).

Second, the circular's poster regulation is impermissible. Paragraph 14d(4) authorizes Commanders to prohibit the display on barracks walls of posters and other items which, in their estimation, constitute "a clear danger to military loyalty, discipline, or morale." Cir. 600–85, ¶ 14d(4). This is obviously too vague a standard by which to regulate First Amendment liberties. *See* Avrech v. Sec. of Navy, 155 U.S.App.D. C. .352, 477 F.2d 1237 (1973); Stolte v. Laird, 353 F.Supp. 1392 (D.D.C.1972); Keyishian v. Bd. of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); NAACP v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1967); Cox v. Louisiana, 379 U.S. 536, 555–558, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

In light of this analysis, the Court concludes that the existing USAREUR drug plan is so interlaced with constitutional difficulties that Cir. 600–85 must be withdrawn and cancelled, along with all earlier related orders and instructions. The Army is, of course, free not only to reestablish its drug rehabilitation program but also to punish drug offenders. The Court requires only that

any directives with regard to disciplinary proceedings, courts martial, administrative discharges, the regulation of posters or the dissemination of drug information conform to the limitations set forth in this Opinion and in the relevant legislation.