UNITED STATES, Appellee

v

ROBERT J. RUIZ, Private, U. S. Army, Appellant

No. 27,249

July 5, 1974

*Major H. M. Hougen* argued the cause for Appellant, Accused. With him on the brief were *Colonel Arnold I. Melnick* and *Captain Howard M. Schmeltzer.*

*Captain R. Craig Lawrence* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Lieutenant Colonel Donald W. Hansen, Major Thomas P. Burns, III, Captain M. Douglas Deitchler,* and *Captain Lawrence D. Martin.*

## OPINION OF THE COURT

DUNCAN, Chief Judge:

This case is before us on the accused's petition which we granted to consider the question whether he was properly convicted of willful disobedience of an order to furnish a urine specimen for urinalysis. The matter arose as follows.

As a part of a campaign to identify and treat, rehabilitate, or eliminate drug offenders in Vietnam, members of the accused's company were required to furnish urine samples for urinalysis. When the accused's sample proved positive, he was sent to a detoxification center. Two weeks after his return to his unit he was scheduled for a follow-up urinalysis in compliance with United States Army Vietnam policy.

At the time of his appointment at the medical center for the procedure, the accused refused to appear or to void the sample of urine. He was taken to his commanding officer, Major Marion L. Davis. Major Davis ordered the accused to void a sample of urine for the purpose of the follow-up urinalysis, and the accused refused to do so.

Major Davis did not intend to court-martial the accused for drug use if the results of the urinalysis were positive,

but he intended in that event to initiate proceedings against him for an administrative discharge.

Before us, the Government argues that the order to furnish a urine sample was legal, as its purpose was not to obtain incriminating evidence from the accused but to implement a command-wide rehabilitation program. Laudable as that program may be, we do not believe it can outweigh the accused's right to refuse obedience to an order, compliance with which would require him to furnish evidence that might tend to incriminate him.

Article 31(a), Uniform Code of Military Justice, 10 USC § 831(a), provides:

No person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him.

This section of the Uniform Code has a broader sweep than the Fifth Amendment to the United States Constitution. United States v Holcomb, 18 USCMA 202, 39 CMR 202 (1969); United States v White, 17 USCMA 211, 38 CMR 9 (1967). Thus, while the Supreme Court in Gilbert v State of California, 388 US 263 (1967), held that no constitutional question was involved in obtaining handwriting samples from an accused in police custody, this Court has interpreted Article 31 of the Code to require compliance with its terms before exemplars can be used. United States v White, supra; United States v Minnifield, 9 USCMA 373, 26 CMR 153 (1958). Similarly, we have held that an order to furnish handwriting exemplars is illegal as violative of the accused's Article 31 right against self-incrimination. United States v Rosato, 3 USCMA 143, 11 CMR 143 (1953).[1]

In United States v Jordan, 7 USCMA 452, 22 CMR 242 (1957), this Court directly held an order to furnish a urine specimen for chemical analysis to be illegal, and set aside the conviction. Significantly, Judge Ferguson, concurring, stated at 456, 22 CMR at 246:

If the first part of Article 31(a) means anything, it means that a superior officer cannot compel a man subject to the Code to give a specimen of his urine to be used to convict him of an offense under the Code, or suffer the penalties of an offense under Article 90 of the Code, supra, which offense in time of war carries the death penalty.

The same result obtained in United States v Forslund, 10 USCMA 8, 27 CMR 82 (1958). There, we repeated the injunction in United States v Jordan, supra, that

"the force of a military order by a superior officer is one of the strongest known to military law" and such an order cannot be employed to "compel a person against his will to produce his urine for the purpose of using it, or an analysis of it, as evidence against him in a court-martial proceeding" without violating Article 31.

*Id.* at 9, 27 CMR at 83. The same reasoning has been applied to strike down an order to submit to a blood alcohol test. United States v Musguire, 9 USCMA 67, 25 CMR 329 (1958).

■ The Government concedes the existence of these precedents, but seeks to distinguish them on the basis that, in each such case, the purpose of the order was to obtain evidence against the accused for use in a court-martial proceeding. The argument too narrowly restricts the accused's right against self-incrimination under Article 31. Aside from cases in which the order is directed towards producing evidence for actual use against the accused in a criminal proceeding, there are those in which, regardless of the order's purpose, the accused knows that compliance will in fact produce incriminating evidence. This is such a case. Here, the accused knew and informed Major Davis that he would not comply with the order because the ensuing urinalysis would prove positive and indicate he had been using drugs. Thus, despite the Major's purpose in giving the order, the accused was

[1] Thus, as we deal here with the broader protections of Article 31, we need not be concerned with the Supreme Court's holding in Schmerber v California, 384 US 757 (1966), that an accused has no Fifth Amendment right to refuse a blood sample to police authorities.

entitled to rely on his Article 31 protection and to refuse obedience to it.

■ Moreover, while the purpose of the order was concededly not to obtain evidence against the accused for use at a court-martial, Major Davis envisioned the use of the test results in an administrative proceeding at which the accused could be subjected to a general discharge.[2] The constitutional prohibition against self-incrimination applies to administrative as well as criminal proceedings. Spevack v Klein, 385 US 511 (1967). We believe that Article 31(a) has at least equal applicability, for it forbids all persons subject to the Code from compelling another to incriminate himself. None of its terms indicate that Congress intended to permit forced self-incrimination in board proceedings any more than in courts-martial. Hence, in light of Major Davis' conceded desire to utilize the urinalysis against the accused in an administrative discharge proceeding, his order for this reason was also in violation of Article 31 and unlawful.

We recognize again the generally beneficent purpose behind the Army's drug rehabilitation program. Even had the Government relied on military necessity as justification for the program, it cannot be operated in a manner inconsistent with the protections with which Congress has clothed an accused. True, urine samples and retests may be essential to the success of the program. The answer lies not in depriving the accused of his rights, however inadvertent that might be, but in assuring either his voluntary cooperation or separating him from the service without penalty. In Gardner v Broderick, 392 US 273 (1968), the Supreme Court held that a police officer may be dismissed from his department, even though he claimed his Fifth Amendment rights, if he refused to cooperate by answering questions specifically, narrowly, and directly related to his official duties. The parallel between *Gardner* and the case before us is obvious. Unfortunately, the procedures utilized here exceeded the scope of those suggested in that case and constituted an invasion of the accused's right to refrain from incriminating himself.[3]

For the reasons stated, we hold Major Davis's order to have been unlawful and that the accused had no duty to obey it. Accordingly, the findings of guilty of willful disobedience must fall.

The findings of guilty of Charge I and its specification are set aside, and the decision of the United States Army Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Army. The Court of Military Review may order a rehearing on the sentence or reassess the sentence on the remaining findings of guilty.

Senior Judge FERGUSON concurs.

QUINN, Judge (dissenting):

In Committee for G I Rights v Callaway, 370 F Supp 934 (DDC 1974), Judge Gesell concluded that a drug abuse prevention plan (USAREUR Circular 600-85) for the U S Army's European Command similar to that before us had such "serious constitutional infirmities" as to require that it be cancelled. Principally, Judge Gesell condemned the program on the ground that it was inordinately intrusive and constituted a mass search "solely to ferret out drugs"; he also determined to be improper the "use for disciplinary purposes of facts developed . . . during participation in a rehabilitative program ordered by reason of an

---

[2] USARV regulations prohibited the use of urinalysis test results obtained in the drug rehabilitation program "in any disciplinary action under the UCMJ, or as a basis for supporting an administrative discharge under other than honorable conditions." United States Army Vietnam Manual No. 600-10, USARV DRUG ABUSE AND REHABILITATION PROGRAM, paragraph 3 (1971). However, a general (less than honorable) discharge may still be based on the results of a forced urinalysis, thus having a serious effect on the accused's future.

[3] In this case, the accused actually received a punitive discharge, confinement at hard labor for 4 months and a forfeiture of $100 per month for 4 months, based in part on disobedience of the order. This is hardly the same as the simple dismissal from the police force involved in *Gardner,* supra.

illegal search." *Id.* at 939. Judge Gesell acknowledged at least two circumstances that serve to make his decision inapplicable to this case. First, he noted that "drug use in the [European] Command has not reached anything comparable to the epidemic proportions detected in Vietnam." *Id.* at 940. Secondly, he distinguished, as this Court has, between a search "solely to ferret out drugs" as evidence of crime and "intrusive searches without probable cause for the sole purpose of placing individuals into a medically oriented drug rehabilitation program, or with placing soldiers merely suspected of drug abuse into such a program." *Id.* at 941. See also Reynolds v McNichols, 488 F2d 1378 (10th Cir 1973) in which the court held it to be a valid exercise of the police power of a state to require examination and treatment for a venereal disease of a person reasonably suspected of having the disease.

In Gardner v Broderick, 392 US 273 (1968), the United States Supreme Court held that a police officer could not be dismissed from the force because he had invoked the right to remain silent, when the purpose of the demand that he speak was in part to obtain evidence for a prosecution against him. 392 US at 279. The Supreme Court recognized, however, that a police officer has a special relationship to the Government, and the Government has a right to inquire into his performance of his responsibilities. It held that the police officer could be questioned "specifically, directly, and narrowly" about the way in which he performed his official duties, and if he refused to answer such questions, the privilege against self-incrimination would not bar his dismissal from the force. 392 US at 278. The relationship between a member of the armed forces and the Government is at least comparable to that of the police officer and the Government. Consequently, in a situation affecting his performance of duty, at least in a zone of armed conflict, the Government can demand that he speak or act to determine his capability. In my opinion, the follow-up aspect of the drug rehabilitation program, as applied to the accused here, falls within the *Gardner* concept.

As of the time the accused was ordered to submit to a urine test, his involvement with the drug program had been solely for the purpose of insuring rehabilitation and his continued physical effectiveness for active duty. Under *Gardner,* therefore, the order to provide a sample of urine was intimately connected with the accused's health and fitness for duty, and it was not part of an effort to discover evidence of misconduct to be used against him. The follow-up procedure to the treatment administered the accused was a reasonable means to insure that, while on duty in Vietnam, the accused retained the capability to carry out the duties required of him. It would have been time enough for the accused to complain about the urinalysis test, if the test results were sought to be used against him for other than health and fitness reasons. As the drug program was applied to the accused, the order to provide a urine sample to further his rehabilitation treatment was legal. I would, therefore, affirm the decision of the Court of Military Review.